TOGUT, SEGAL & SEGAL LLP
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut
Neil Berger
Minta J. Nester

*Attorneys for the Chapter 7 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                    :

In re:                                 :      Chapter 7

                                    :

KOSSOFF PLLC,             :      Case No. 21-10699 (DSJ)

                                    :

               Debtor.      :

------------------------------------------------------------ X
                                    :

ALBERT TOGUT, Not Individually but Solely  :
in His Capacity as Chapter 7 Trustee of the   :
Estate of Kossoff PLLC,               :

                                    :      Adv. Pro. No. 23-_____ (DSJ)

              Plaintiff,      :

                                    :

           v.                  :

                                    :

SALLY E. UNGER;  and              :
THE SALLY E. UNGER FAMILY TRUST,   :

                                    :

             Defendants.      :
------------------------------------------------------------ X

## <u>COMPLAINT</u>[1]

        Albert Togut, not individually but solely in his capacity as the Chapter 7

Trustee (the "<u>Plaintiff</u>" or the "<u>Trustee</u>") of the estate of Kossoff PLLC (the "<u>Debtor</u>"),

by his attorneys, Togut, Segal & Segal LLP, hereby makes this complaint

(the "<u>Complaint</u>") against Sally E. Unger ("<u>Unger</u>") and the Sally E. Unger Family Trust

---

[1]    Pursuant to an order of the Court [Docket No. 608], the time within which to commence this Adversary Proceeding (as defined below) was extended to and including June 14, 2023.  A draft of this Complaint was provided to Defendants substantially prior to it being filed.

(the "Unger Trust" and together with Unger, "Defendants"), and in support thereof respectfully alleges the following upon information and belief:

**SUMMARY OF THE ACTION**[2]

1.      Prior to being disbarred and sent to prison on May 6, 2022 for stealing millions of dollars from the Debtor and dozens of the Debtor's clients, Kossoff was a prominent real-estate attorney in New York City. Kossoff formally organized the Debtor under the laws of the state of New York on December 6, 2013. Kossoff was always the Debtor's sole member and manager.

2.      Kossoff's fraud involved a varied cast of parties, including, without limitation, well-known and influential participants in the New York City real estate industry, personal affiliates, and "fast-cash" merchant cash lenders. This Adversary Proceeding involves an individual whose transactions with Kossoff encompass elements of all of the above: Sally E. Unger, New York State Supreme Court Justice, currently presiding in Part 24 of the Queens County, Civil Term of the New York State Supreme Court (the "NYS Supreme Court").

3.      Kossoff and Unger deliberately skirted applicable New York State partnership law and instead implemented their vague 2013 Agreement to address their prepetition claims against each other. The winners of the 2013 Agreement were Unger, who, after "ascending to the bench," obtained windfalls in the forms of fraudulent transfers that she extracted from the Debtor to offset her claims against Kossoff and her Kossoff-related investment losses, and Kossoff, who satisfied personal obligations while currying favor with a sitting judge in a court in which the Debtor practiced. The losers

---

[2]   Capitalized terms used but not defined in this section shall have the meanings ascribed to them in subsequent sections of this Complaint.

of this arrangement were the Debtor, whose funds were siphoned for Unger's purposes, and the Debtor's creditors.

4.      Unger was Kossoff's partner in the unincorporated law firm then-known as Kossoff & Unger ("K&U").  K&U existed before the Debtor was formed but it did not file any documents to be formally organized as a partnership, limited liability company, or corporation under state law.  However, Unger had a deep and unique understanding of Kossoff, his financial affairs, and of the Debtor.  Unger also invested in several of Kossoff's other ill-fated personal business ventures, which operated separately from K&U and the Debtor, including:  (i) Tenantracers, a now-defunct residential tenant surveillance service founded by Kossoff;  (ii) Farmview, Kossoff's failed real estate development project in upstate New York;  (iii) MBK Group, an investor syndicate of Kossoff's business affiliates formed to buy and sell real estate in New York City;  and (iv) Gregory's Messenger Service, a messenger and delivery company formed by Kossoff.

5.      In or around December 2013, Unger withdrew from the partnership that was K&U.  Pursuant to New York State partnership law, Unger's withdrawal dissolved K&U and that should have caused Kossoff and Unger to account for partnership assets and undertake to wind-up K&U's affairs.  However, neither an accounting nor a wind-up of K&U occurred.  Instead, Kossoff and Unger executed the haphazard 2013 Agreement in their personal capacities, which said nothing of K&U, its dissolution, or the distribution of its assets.  Rather, the 2013 Agreement created yet another personal obligation of Kossoff that he satisfied by misappropriating funds in the Debtor's bank accounts.  Indeed, the Debtor's funds used to pay Defendants were property of the Debtor and they should have been available to the Debtor's creditors. The 2013 Agreement Payments total $221,906.70.

6.     The 2013 Agreement provided for payment by Kossoff, not the Debtor, to Unger of the Receivership Commissions that were related to Receiverships that Unger handled while at K&U.  Although the Debtor is not referenced in the 2013 Agreement, the Debtor's attorneys spent time and expended Debtor resources to satisfy Kossoff's obligations to Unger under the 2013 Agreement.  To that end, after withdrawing from K&U, Unger regularly corresponded with Kossoff and the Debtor's staff of attorneys regarding the Receiverships.  In extensive email communications, Unger pressured, criticized, and advised Kossoff and the Debtor's staff of attorneys regarding the Receiverships in the NYS Supreme Court to secure the Receivership Commissions.

7.     In addition, within ninety (90) days prior to the Petition Date, Unger advanced $125,000 to Kossoff from the Unger Trust into Kossoff's personal bank account as a short-term loan.  The Debtor thereafter improperly made payments on account of this personal loan to the Unger Trust totaling $110,000 in accordance with payment instructions provided by Unger, which along with the 2013 Agreement Payments, constitute Avoidable Payments totaling $331,906.70.

8.     The transfers by the Debtor to Defendants benefitted Kossoff by reducing his personal obligations under the 2013 Agreement and currying favor with a sitting New York State judge in a court in which the Debtor practiced, all while the Debtor was insolvent under any measure of insolvency.  As a result, the Avoidable Payments are presumed to have been made with actual intent to defraud the Debtor's creditors.  Kossoff also appears to have had an incentive to make the Avoidable Payments to Unger because she had hired Kossoff's son as an intern in her Chambers prior to the Petition Date.

9. Unger was anything but an innocent victim of Kossoff's improper and criminal conduct, and she was not a good faith transferee for value regarding the improper transfers that she obtained from the Debtor.

10. The Avoidable Payments neither conferred a benefit to the Debtor nor advanced any legitimate business purpose for the Debtor.

11. For the benefit of the Debtor's estate, the Trustee commences this Adversary Proceeding to avoid and recover the Debtor's transfers to and for the benefit of Defendants as fraudulent conveyances or, in the alternative and subject to proof, as preferential transfers.

### THE PARTIES AND RELEVANT NON-PARTIES

12. Plaintiff is the Chapter 7 Trustee of the Debtor.

13. Defendant Unger is a person residing in New York State.

14. As of the date of this Complaint, Defendant Unger serves as a Justice on the NYS Supreme Court, Civil Term, Part 24, a position she has held since January 2017.

15. Defendant Unger Trust is a New York trust organized under the laws of New York State.

16. Defendant is a trustee of Defendant Unger Trust.

17. At all times relevant to this Complaint, non-party Mitchell H. Kossoff ("Kossoff"), was an "insider" of the Debtor pursuant to section 101(31)(B) of title 11 of the United States Code (the "Bankruptcy Code") because Kossoff was the Debtor's sole member.

18. At all times relevant to this Complaint, non-party Tenantracers, LLC ("Tenantracers") was an "insider" of the Debtor pursuant to Bankruptcy Code section 101(31)(E) because Kossoff was an officer and shareholder of Tenantracers.

19. Tenantracers is defunct.

20. At all times relevant to this Complaint, Unger owned a 15% equity interest in Tenantracers.

21. The Debtor's Articles of Organization were filed with the New York Secretary of State on December 6, 2013.

22. From its inception until April 13, 2021 (the "Petition Date"), the Debtor served clients in New York City's real estate industry.

23. Kossoff has been disbarred and he is now incarcerated, serving a jail term of 4.5 years to 13.5 years, based on his own admission that he stole more than $14 million from the Debtor, its clients and others.

24. Over the course of his career, Kossoff operated and/or was associated with several law firms bearing his name, including: (1) Kossoff, Alper & Unger ("KA&U"); (2) K&U; and (3) the Debtor.

25. KA&U and K&U ceased to operate as law firms prior to the Debtor's formation and organization in December 2013.

## JURISDICTION AND VENUE

26. The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this adversary proceeding (the "Adversary Proceeding") pursuant to 28 U.S.C. §§ 157 and 1334 and the United States District Court for the Southern District of New York's *Amended Standing Order of Reference, M-431* dated January 31, 2012, which refers such proceedings to this Court.

27. This Adversary Proceeding is commenced pursuant to sections 502(d), 544, 547, 548, and 550 of the Bankruptcy Code; Rules 3007, 6009, and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); sections 273, 274, 275, 276, 276-a, 278, and 279 of the New York Debtor & Creditor Law as applicable to

transactions occurring before April 4, 2020 (the "NYDCL");  and sections 3304 and 3306 of title 28 chapter 176 of the United States Code (the "FDCPA").

28.     This Adversary Proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (F), (H), and (O), and this Court has jurisdiction to hear and to determine this Adversary Proceeding and to enter a final order and judgment herein.  In the event that this Court or any other court finds any part of this Adversary Proceeding to be "non-core," this Court has non-core concurrent jurisdiction over this Adversary Proceeding under 28 U.S.C. § 1334 because the relief sought herein relates to the above-captioned Chapter 7 case (the "Chapter 7 Case") and will have a material impact on the administration of the Debtor's estate.

29.     Plaintiff consents to entry of final orders and judgments by this Court in this Adversary Proceeding pursuant to Bankruptcy Rule 7008.  Plaintiff also consents to entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

30.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409 because this Adversary Proceeding arises in, and is related to, the Chapter 7 Case.

## FACTUAL ALLEGATIONS

### I.     The K&U Law Firm

31.     Prior to 2013, Kossoff and Unger operated the law firm known as K&U.

32.     Kossoff and Unger held themselves out as being "partners" of the K&U law firm.

33.     Indeed, correspondence bearing K&U letterhead includes both Kossoff and Unger listed separate from the other attorneys working at K&U.

34.     However, Kossoff and Unger never executed a written partnership agreement for K&U.

35.     As a partner of K&U, Unger, on behalf of K&U, served as counsel to court-appointed receivers in real estate actions pending in New York State and federal courts (collectively, the "Receiverships").

36.     K&U collected legal fees and commissions in connection with the Receiverships for which Unger was owed commissions from K&U (collectively, the "Receivership Commissions").

37.     In certain instances, K&U failed to distribute to Unger the Receivership Commissions in full and on a timely basis.

38.     On August 15, 2012, Kossoff executed a letter to Unger (the "August 2012 Letter") in which Kossoff acknowledges that he owed $294,504.28 to Unger on account of unpaid Receivership Commissions from the amounts collected by K&U in connection with the Receiverships.

39.     The August 2012 Letter also acknowledges that Kossoff owed Unger approximately $12,000 on account of "loaned funds," loaned by Unger to one of Kossoff's other non-Debtor businesses, as described in more detail below.

40.     Although the August 2012 Letter acknowledged the Receivership Commission amount owed, it did not set forth any terms for the payment of the Receivership Commissions by K&U or Kossoff, or the source of partnership funds or assets to pay the Receivership Commissions.

II.     **K&U Dissolves as a Partnership**

41.     On November 5, 2013, Unger was elected to serve as a judge in the New York City Civil Court, Queens County, 2nd District, which became effective the following January 2014.

42.     During the period of January 2017 until the Petition Date, Unger served as a Justice on the NYS Supreme Court, Civil Term, Part 24.

43.     On December 20, 2013, Unger transmitted via email a letter to Kossoff bearing the subject "Necessary Name Changes" (the "December 2013 Name Change Letter"), which provided that "due to my ascension to the bench it is necessary for my name to be removed from anything and everything associated with the law firm formerly known as Kossoff & Unger."

44.     The December 2013 Name Change Letter, which acknowledges Unger's new full-time employment as a judge of the New York City Civil Court, demonstrates that Unger fully withdrew from the partnership that was K&U when Unger became a sitting New York State court judge.

45.     On the other hand, Kossoff and Unger never executed any written agreement describing the effect of Unger's "ascension to the bench," *i.e.*, withdrawal, on the partnership that was K&U, nor any written agreement related to the distribution of K&U partnership assets in light of such withdrawal.

46.     Nevertheless, pursuant to applicable New York State partnership law, Unger's appointment to the bench caused K&U to dissolve.  *See* NY Partnership Law § 60 ("The dissolution of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business.").

47.     Once dissolved, Kossoff and Unger did not undertake the winding up of K&U's affairs, as required under New York law, despite that K&U continued to exist for that limited purpose by operation of New York law.  *See* NY Partnership Law § 61 ("On dissolution the partnership is not terminated, but continues until the winding up of partnership affairs is completed.").

48.     Instead, on June 7, 2013, Kossoff and Unger executed an agreement (the "2013 Agreement") that memorialized amounts owed to Unger for unpaid Receivership Commissions and unpaid salary during 2012.

49.     The 2013 Agreement provided that "the parties wish to set forth the terms and conditions of payments due to Unger for 2012 past due salary, as well as past due commissions."

50.     The 2013 Agreement provided that (i) "Unger is owed the principal sum of...[$64,695.28] representing past due salary for the tax year 2012," and (ii) "Unger is also owed the principal sum of $243,016.04" on account of the Receivership Commissions.

51.     The 2013 Agreement does not reference K&U, any partnership assets, or the partnership's status in dissolution.

52.     The 2013 Agreement provides that "past due commissions shall be paid as outstanding invoices to Unger's clients are paid."

53.     Kossoff and Unger each signed the 2013 Agreement in their personal capacity on signature lines that bear each's name with no job title or firm signature block.

54.     The 2013 Agreement does not include any reference to the Debtor or any obligations of the Debtor.

55.     Indeed, the Debtor's Articles of Organization were not filed until more than five (5) months after the 2013 Agreement was signed.

56.     However, as set forth in more detail below, the Debtor made payments to Unger on account of K&U and Kossoff's personal obligations totaling $221,906.70.

## III.     The 2021 Loan

57.     On the morning of January 28, 2021, within ninety (90) days prior to the Petition Date, and while Kossoff was stealing millions of dollars from the Debtor and its clients, Kossoff sent an email to Unger (the "January 2021 Email") asking "I have a number of pressing debts which I must pay! If there is any way you can wire into my business account today $125k (really need $200k) that would be extremely helpful."[3]

58.     The January 2021 Email, which bears the subject line "PPP Loan," provides that Kossoff would repay Unger the amount advanced from the proceeds of a "substantial PPP loan" that the Debtor had obtained approval to receive.

59.     Later that day, Unger transferred $125,000 (the "2021 Loan") into Kossoff's personal bank account at JPMorgan Chase, not the Debtor's bank account.

60.     Kossoff and Unger did not execute any promissory note or other written agreement in connection with the 2021 Loan.

61.     As set forth in more detail below, the Debtor made payments to Unger totaling $110,000 on account of the 2021 Loan within ninety (90) days of the Petition Date.

## IV.     Kossoff and Unger's Other Business Affiliations

### A.     Tenantracers LLC

62.     Pursuant to an operating agreement dated January 1, 2003 (the "TT Operating Agreement), and at all times thereafter until the Petition Date, Kossoff operated Tenantracers as a residential tenant surveillance services business.

---

[3]     During the end of 2020 and into 2021, the Debtor had been borrowing heavily from Merchant Cash Advance lenders.  Indeed, Kossoff had told Apex Funding Source LLC that PPP loan proceeds would be available to satisfy amounts also owed to Apex Funding Source LLC.

63.     Tenantracers' Articles of Organization were filed with the New York Department of State on December 31, 2002, years before the Debtor was incorporated.

64.     As set forth in the TT Operating Agreement, Kossoff, the sole "Class B Member" of Tenantracers, was managing member of Tenantracers and owned forty-five percent (45%) of its equity.

65.     As a Class B Member of Tenantracers, Kossoff was not entitled to a preferred return on account of his 45% membership interest in Tenantracers.

66.     As set forth in the TT Operating Agreement, Unger was a "Class A Member" of Tenantracers and owned ten percent (10%) of its equity.

67.     As a Class A Member of Tenantracers, Unger was entitled to a preferred return on account of her 10% membership interest.

68.     In connection with her 10% membership interest in Tenantracers, Unger made an initial capital contribution to Tenantracers in the amount of $50,000.

69.     On November 14, 2006, Kossoff executed a letter to the Class A Members of Tenantracers bearing the subject "Tenantracers' Expansion," in which Kossoff solicited additional capital contributions from the Class A Members in connection with Tenantracers' move into the office space located at 217 Broadway, Suite 309, New York, New York 10007 (the "Third Floor Premises").

70.     Unger's capital contribution in connection Tenantracers' expansion was $15,000.

71.     Tenantracers occupied the Third Floor Premises at all times relevant to this Complaint until the Petition Date.

72.     The Debtor never occupied the Third Floor Premises.

73.     On February 9, 2007, Kossoff executed a letter to Unger bearing the subject "Tenantracers' Investment" (the "Unger 2007 TT Investment Letter").

74.     The Unger 2007 TT Investment Letter provided that it "will memorialize [Kossoff and Unger's] agreement in connection with [Unger's] purchase of additional 5% Class A Interest in TenanTracers LLC."

75.     In addition, the Unger 2007 TT Investment Letter provided that the purchase price "for [Unger's] additional interest is the sum of $32,500."

76.     Unger's investment in Tenantracers as set forth in the Unger 2007 Investment Letter increased Unger's Class A Member interest, and therefore Unger's share of preferred returns, to fifteen percent (15%).

77.     Unger contributed at least $97,500 in capital to Tenantracers prior to the Petition Date (the "Unger Tenantracers Investment").

78.     For each tax year between 2012 through and including 2021, IRS Schedule K-1 forms list Unger as holding a 15% interest in the "share of profit" of Tenantracers.

79.     As set forth in the "List of Members, Class, Capital, and Percentages," annexed as an exhibit to the TT Operating Agreement, the remaining membership interests in Tenantracers belonged to Phyllis Kossoff (Kossoff's now-deceased mother) (25%) and Ernest Perevoski (20%), both of whom were Class A Members and made capital contributions of $250,000 and $200,000, respectively.

80.     Tenantracers' tax returns for the tax years between 2018 through and including 2021, list Unger in the "section 199A W-2 Wages" as having received wages from Tenantracers in each of those years (the "Unger Tenantracers Wages").[4]

---

[4]     Unger produced Tenantracers' tax returns to the Trustee prior to the filing of this Complaint and pursuant to a subpoena served on Unger by the Trustee, *see* Affidavit of Service [Docket No. 378], as

81.     The Unger Tenantracers Wages listed in Tenantracers' tax returns for the tax years from 2018 through and including 2021 indicate hundreds of thousands of dollars in wages were paid to Unger from Tenantracers:  (a) the 2018 Tenantracers tax return shows section 199A W-2 Wages to Unger in the amount of $113,958;  (b) the 2019 Tenantracers tax return shows section 199A W-2 Wages to Unger in the amount of $122,961;  (c) the 2020 Tenantracers tax return shows section 199A W-2 Wages to Unger in the amount of $99,679;  and (d) the 2021 Tenantracers tax return shows section 199A W-2 Wages to Unger in the amount of $10,392, totaling $346,990.

82.     The aforementioned Tenantracers' tax returns show that it was insolvent for years prior to the Petition Date, including the years during which Unger received wages from Tenantracers.

83.     In addition, between at least December 2016 and August 2021, Tenantracers agreed to repay millions of dollars in connection with numerous high-interest-rate cash-advance transactions that purportedly pledged Tenantracers' future accounts receivable as collateral for same-day cash advances, even when Tenantracers' account receivables were insufficient to satisfy the obligations to those case advance lenders.

84.     In a March 5, 2021 letter agreement that was signed by Unger, Kossoff, in his individual capacity, agreed to "purchase all of the membership interests in the LLC known as and by Tenantracers LLC (hereinafter "TT") owned by Sally E. Unger" for $105,000.

---

authorized by the Court's *Order Authorizing Discovery Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedures* [Docket No. 27], entered on May 24, 2021.

**B. Unger's Investments in Kossoff's Other Ventures**

85.     Unger also purchased equity interests in Kossoff's other real estate investment and business ventures (the "Unger Ancillary Investments" and together with the Unger Tenantracers Investment, the "Unger Investments").

**i.     Hi-Powered Delivery Systems LLC
a/k/a Gregory's Messenger Service LLC**

86.     Pursuant to an operating agreement dated August 1, 2003 (the "Gregory Messenger Operating Agreement), Kossoff was a managing member of Gregory's Messenger Service, LLC ("Gregory's Messenger Service"), a company organized for the purpose of the ownership and operation of a messenger, courier and delivery service.

87.     As set forth in the Gregory Messenger Operating Agreement, Kossoff, a "Class B Member" of Gregory's Messenger Service, owned twenty-five percent (25%) of its equity and was not entitled to preferred returns on his membership interest.

88.     As set forth in the Gregory Messenger Operating Agreement, Unger, a "Class A Member" of Gregory's Messenger Service owned twenty-five percent (25%) of its equity.

89.     As a Class A Member of Gregory's Messenger Service, Unger was entitled to a preferred return on account of her 25% membership interest.

90.     In connection with her 25% membership interest in Gregory's Messenger Service, Unger made an initial capital contribution of $100,000.

91.     In addition, on May 1, 2004, Kossoff executed a promissory note on behalf of Gregory's Messenger Service, as borrower, in favor Unger, as lender, in the amount of $50,000.

92.     Thereafter, the name of Gregory's Messenger Service was changed to "Hi-Powered Delivery Systems LLC," as demonstrated in Schedule K-1 forms for the tax years 2012 through and including 2015 that list Unger as a 25% equity holder in the company.

ii.     **Farmview Estates LLC**

93.     Pursuant to an operating agreement dated December 8, 2004 (the "Farmview Operating Agreement), Kossoff was a managing member of Farmview Estates, LLC ("Farmview"), a company organized for the purpose of the acquisition, development, improvement and sale of certain real property located in Duchess County, New York.

94.     As set forth in the Farmview Operating Agreement, Kossoff, a "Class B Member" of Farmview, owned ten percent (10%) of its equity and was not entitled to preferred returns on his membership interest.

95.     As set forth in the Farmview Operating Agreement, Unger, a "Class A Member" of Farmview, owned four percent (4%) of its equity.

96.     As a Class A Member of Farmview, Unger was entitled to a preferred return on account of her 4% membership interest.

97.     In connection with her 4% membership interest in Farmview, Unger made an initial capital contribution of $200,000.

98.     Farmview failed and it was unable to repay investments made by its members, including Unger.

iii.     **MBK Group LLC**

99.     Pursuant to an operating agreement dated November 17, 2005 (the "MBK Group Operating Agreement), Kossoff was a managing member of MBK Group, LLC ("MBK Group"), a company organized for the purposes of the acquisition,

ownership, management, leasing, development, improvement and sale of certain real property located in New York City.

100.    As set forth in the MBK Group Operating Agreement, Unger, a "Member" of MBK Group, owned 1.8519% of its "priority membership" interests and 1.1111% of its "residual membership" interests.

101.    As a member of MBK Group, Unger was entitled to a preferred return on account of her membership interest.

102.    In connection with her membership interest in MBK Group, Unger made an initial capital contribution of $125,000.

103.    According to Unger's own written statements to Kossoff, the Unger Investments were a failure that caused Unger to lose significant sums of money over the course of years.

104.    Indeed, in an email exchange between Kossoff and Unger on January 20 and 21, 2018 (the "January 2018 Emails"), Unger stated that "I've lost hundreds of thousands of dollars due to various investments with you...I didn't insist on a mortgage with Farmview like some others did.  The [accounts] with [Hi-Powered Delivery Systems LLC] were sold without you so much as discussing it with me first. And I haven't seen a dime from TenanTracers in many many years."

## V.    Kossoff Uses Debtor Funds to Pay Non-Debtor Obligations Owed by Tenantracers and Kossoff Personally

105.    Defendants had no interest in, or claims against, the Debtor and none of the Avoidable Payments (defined below) were made to satisfy any Debtor obligations.

106.    However, between March 7, 2014 and March 19, 2021, less than one month prior to the Petition Date, Kossoff caused the Debtor to make improper

payments totaling $331,906.70 to and for the benefit of Defendants directly from the Debtor's bank accounts on account of Kossoff's personal obligations to Defendants set forth above (collectively, the "<u>Avoidable Payments</u>").

107.    Defendants had actual knowledge that the Avoidable Payments were made with Debtor funds because Defendants accepted the Debtor's checks for such payments and wires from the Debtor's bank accounts in response to Unger's demands for payment.

108.    Defendants had actual knowledge that the Avoidable Payments were made with Debtor funds because Kossoff acknowledged this fact in writings to Defendants, and he assured Unger in writing that the Debtor would satisfy the obligations of the dissolved K&U and Kossoff personally pursuant to the 2021 Loan.

**A.      The Debtor Pays Unger Pursuant to the 2013 Agreement**

109.    Kossoff caused the Debtor to make direct payments from the Debtor's bank accounts to Unger on account of Kossoff's personal obligations in connection with the 2013 Agreement.

110.    Specifically, between March 7, 2014 and April 5, 2018, the Debtor made payments to Unger on account of Kossoff's personal obligations in connection with the 2013 Agreement totaling $221,906.70 (the "<u>2013 Agreement Payments</u>").  A schedule listing the 2013 Agreement Payments is attached hereto as **<u>Exhibit 1</u>** and is incorporated by reference as if fully set forth herein.

111.    As set forth in **<u>Exhibit 1</u>**, the funds used to make the 2013 Agreement Payment on April 5, 2018 originated from the Debtor's IOLA account.

**B.      The Debtor Pays Unger Trust on Account of Kossoff's Loan Obligations**

112.    Kossoff caused the Debtor to make direct payments from the Debtor's bank accounts to Unger Trust on account of the 2021 Loan.

113.     Specifically, Kossoff caused the Debtor to make two transfers to Unger Trust, respectively on February 19, 2021 and March 19, 2021, just weeks before the Petition Date, totaling $110,000 (the "2021 Loan Payments").  A schedule listing the 2021 Loan Payments is attached hereto as **Exhibit 2** and is incorporated by reference as if fully stated herein.

114.      As demonstrated above, no written agreement was executed by Kossoff and Unger in connection with the 2021 Loan, the proceeds of which were deliberately deposited into Kossoff's personal bank account.

115.     As set forth in **Exhibit 2**, the 2021 Loan Payments were made within ninety (90) days prior to the Petition Date.

**VI.     Unger Did Not Receive the 2013 Agreement Payments in Good Faith
         and Caused Harm to the Debtor in Pursuing the 2013 Agreement Payments**

    **A.     Unger Improperly Conflates Her Alleged
         Entitlement to the Receivership Commissions with the
         Unger Investment Losses as Part of a Joint Recovery Effort**

116.     As discussed above, Kossoff and Unger did not dissolve K&U in accordance with applicable New York state partnership law.

117.     Under applicable New York State partnership law, Kossoff and Unger were required to conduct an accounting of K&U partnership assets and undertake to wind-up K&U's affairs.

118.     Kossoff and Unger appear to have had no intention to wind up K&U's affairs in accordance with applicable law.

119.     In September 2015, nearly two years after Unger "ascended to the bench," Kossoff and Unger had an email exchange (the "September 2015 Emails") that demonstrates their lack of any intention to wind up K&U's affairs in accordance with applicable law.

120. In the September 2015 Emails, Unger stated that "I would like to sit down with you...to do a complete reconciliation of commissions."

121. Kossoff responded:

"Before we meet would like to talk further about how we are adjusting the commissions on matters where some legal bills were generated before you left and other significant fees were expended on the same matter after you departed. Also I want to know whether it is still your position that I must absorb 100 percent of all losses on these matters no matter what they are while you are still entitled to 25 percent of whatever is actually collected."

122. Unger responded in relevant part that "[a]ll I am asking for is a complete accounting, which is the same thing I've been asking for since March."

123. With no agreement in place governing the wind up of K&U's affairs, default rules under New York State partnership law should have governed Kossoff and Unger's conduct.

124. Instead, and under the guise of the 2013 Agreement, which was executed by Kossoff personally and does not even refer to K&U, Unger looked to the Debtor to collect the Receivership Commissions.

125. Moreover, Unger improperly conflated her losses related to the Unger Investments with her rights, if any, in connection with the dissolution of the K&U partnership, which occurred when Unger withdrew from K&U.

126. For example, in the January 2018 Emails, Unger stated that "[w]hen we have discussed receivership fees in the last few years you have always made it clear that I would receive 'the lion's share' of what was coming in as your way of making it up to me that I had lost so much money with Farmview, Tenantracers & Hipowered Messenger."

**B.** **Unger Interferes in the Debtor's Operations**
      **While Serving as a Sitting New York State Judge**

127.    On numerous occasions after withdrawing from K&U to serve as a judge of the NYS Supreme Court, Unger corresponded with Kossoff and the certain of the Debtor's other staff attorneys regarding the Receiverships.

128.    Unger repeatedly sought updates regarding the Debtor's efforts to collect the Receivership Commissions, pressured Kossoff and the Debtor's other staff attorneys, and even provided advice regarding certain Receiverships concerning how to interact with another sitting Judge.

129.    For example, on January 15, 2016, in response to an update from Kossoff on the Receivership Commissions, Unger emailed Kossoff stating that "[s]ome of these 'updates' are more like 'stagnation.'"

130.    On April 4, 2016, in response to an update from Kossoff regarding a motion for payment of fees in a Receivership matter, Unger replied that:

> "Your message from last night is old news. The motion was done nearly 2 weeks ago, but still no motion date has been set. Overall, I've gotta say that I'm truly disappointed in you. Nearly all of these receiverships have lain fallow for 2-1/2 yrs since I left the firm. It seems as though you have no control over the cases in your office...I even gave you notes in January for what needed to be done on the cases to generate discussion with you since it was clear that you had no idea what little was going on with the Receiverships...FOCUS!!!"

131.    On October 5, 2016, Unger emailed a Debtor staff attorney, copying Kossoff, asking if "there is any update/progress on collection on the Schlesinger judgment for receivership atty's fees?"

132.    On March 7, 2017, Unger had the following email exchange with a Debtor staff attorney:

a. Unger – "Please have someone also call chambers or write a letter to J. Sherman; not to pressure him but to find out if the motion was

denied. That motion was submitted 8 months ago. It seems as though it could have fallen between the cracks. Things get lost in the Bronx Clerk's Office all the time."

b. Debtor Attorney – "We did. [Other Debtor attorney] has been calling."

c. Unger – "And??? What was [other Debtor attorney] told? As for Jason, clearly nagging isn't working. What is your plan B? I've told you several times that he isn't someone you can trust. He's going to drag it out as long as you allow him to do so."

133.    On June 29, 2017, Unger emailed Kossoff and a Debtor staff attorney stating "[p]lease advise why distribution of $ hasn't been made yet.  I thought the funds just needed to clear."

C.    **The Suspicious Accounting and Reporting Surrounding the 2013 Agreement Payments**

134.    The lack of formality surrounding the dissolution and winding-up of K&U was followed by discrepancies in the accounting of the 2013 Agreement Payments.

135.    On March 29, 2016, Unger sent an email to Kossoff and other Debtor attorneys stating "[p]lease be remined that the UCS 876 must be filed by 3/31 concerning all fiduciary compensation received by the law firm & its attys for the year 2015."[5]

136.    Based on the Debtor's books and records, as reported by the Debtor's bookkeeper, Julia McNally, Unger was informed by a legal assistant employed by the Debtor in an email also sent on March 29, 2016 that the "[Debtor] didn't collect any money last year.  I believe we only have to file if we collect over $50k."

---

[5]    Unger's reference to "UCS 876" is to a *Report of Compensation Received by Law Firm Appointments Pursuant to Part 36 of the Rules of the Chief Judge*, as required under 22 NYCRR § 36.4(d), which provides that "[a] law firm whose members, associates and employees have had a total of $50,000 or more in compensation approved in a single calendar year for appointments made pursuant to this Part shall report such amounts on a form promulgated by the Chief Administrator."

137.     Unger responded that same day instructing the Debtor's legal assistant to "Please confirm that with [Debtor attorney] privately.  I think Julia's numbers may be wrong. I'm pretty sure there were a couple times when I got paid last year because the firm was paid. I could be wrong but it just doesn't seem right that noting came in."

138.     On March 30, 2016, the Debtor's legal assistant sent an email to Unger advising that "[t]he order approving compensation awards us approximately $25k.  But Julia [McNally] has no record of us depositing that amount."

139.     Unger responded that same day that "Maybe Mitch deposited it & forgot to tell her."

140.     Indeed, as set forth in **Exhibit 1**, the Debtor made payments to Unger during the 2015 calendar year totaling $81,636.05.

141.     Moreover, on May 1, 2017, Kossoff sent an email to Julia McNally and Unger bearing the subject line "1099 Attached," and stated:

> "Julia do not send this form to the IRS until I review and discuss I may just want to categorize it as [] a payment of a loan balance and write it off somewhere else so Sally does not have to pay taxes on it."

142.     Unger forwarded the May 1, 2017 email to her accountant on May 5, 2017 and stated that "I have to figure out whether/how to report it on my annual financial disclosure."

143.     Finally, the Debtor prepared 1099-Misc forms for Unger for each tax year at least from 2015 through and including 2018, which memorialized the 2013 Agreement Payments in each respective tax year.

**VII.    The Debtor Received No Value for
Making the 2013 Agreement Payments to Unger**

144.    The Debtor is not an obligor under the 2013 Agreement.

145.    The Debtor received no value or benefit in exchange for the 2013 Agreement Payments that were made to and for the benefit of Unger.

146.    Kossoff's personal obligations under the 2013 Agreement did not advance any legitimate business purpose for the Debtor.

147.    Unger received the value from the 2013 Agreement Payments.

148.    Unger obtained a windfall from the Debtor after she and Kossoff neglected the winding-up of K&U, all at the expense of the Debtor's creditors and its clients, and she received protection of her equity and creditor interests in Kossoff's non-Debtor failing businesses.

149.    As to Kossoff, he avoided a proper accounting and winding-up process that would have required the furnishing of complete and accurate books and records.

150.    On the other hand, the 2013 Agreement Payments and the efforts to collect the Receivership Commissions attendant thereto materially and substantially harmed the Debtor and its creditors.

151.    Kossoff acknowledged the detriment to the Debtor in connection with the Receiverships in the January 2018 Emails exchange, stating in an email to Debtor attorneys and Unger that "the [time] may have arrived to pull the plug on this matter if recovery appears to be remote without the expenditure of significant further legal time."

152.    Unger responded, "This is the last significant receivership fee outstanding...I don't think its fair that you're planning on pulling the plug on this as well."

153.    In subsequent emails to Unger, Kossoff stated, "I have to make th[e] decisions necessary to maintain my practice otherwise I will have no money to pay anybody anything," and "I have spent I believe well over $500k to try and recover sums for you across all of the receiverships."

154.    And yet, on April 5, 2018, Unger accepted the final 2013 Agreement Payment, which was a $7,000 transfer from the Debtor's IOLA Account.

155.    After Unger ascended to the bench, Kossoff had incentives to continue siphoning Debtor funds to make the Avoidable Payments based on, among other things:  (a) the Debtor practicing in the same court in which Unger sat as a judge; and (b) Unger hiring Kossoff's son as a legal intern in her Chambers prior to the Petition Date.

**VII.    The Debtor Was Insolvent, Had an Unreasonably Small Capital Base, and Incurred, and Intended to Incur, Debts Beyond the Debtor's Ability to Repay the During the Relevant Time Period**

156.    The Debtor's books and records demonstrate that the Debtor was insolvent no later than December 31, 2013 and remained insolvent at all relevant times thereafter until the Petition Date, by any measurement of insolvency.

157.    The following balance-sheet analysis of the Debtor's assets and liabilities based upon the Debtor's records demonstrates the Debtor's insolvency:

| DATE | ASSETS | LIABILITIES | NET ASSETS |
|---|---|---|---|
| 12/31/2013 | $572,508 | $2,840,663 | ($2,268,155) |
| 06/30/2014 | $233,469 | $2,844,222 | ($2,610,752) |
| 12/31/2014 | $843,893 | $2,804,103 | ($1,960,210) |
| 01/26/2015 | $585,160 | $3,220,650 | ($2,635,490) |

| DATE | ASSETS | LIABILITIES | NET ASSETS |
|---|---|---|---|
| 06/30/2015 | $1,367,474 | $5,432,675 | ($4,065,201) |
| 12/31/2015 | $770,028 | $7,386,390 | ($6,616,362) |
| 06/21/2016 | $1,009,438 | $7,850,757 | ($6,841,319) |
| 06/30/2016 | $757,104 | $8,829,352 | ($8,072,248) |
| 12/31/2016 | $1,310,242 | $11,800,038 | ($10,489,796) |
| 06/30/2017 | $1,377,668 | $12,327,635 | ($10,949,967) |
| 12/31/2017 | $1,202,186 | $14,392,997 | ($13,190,811) |
| 06/30/2018 | $1,392,697 | $15,859,134 | ($14,466,437) |
| 12/31/2018 | $1,688,485 | $19,211,671 | ($17,523,187) |
| 06/30/2019 | $1,834,435 | $20,545,379 | ($18,710,944) |
| 12/31/2019 | $1,207,978 | $25,479,490 | ($24,271,512) |
| 06/30/2020 | $1,375,584 | $27,387,619 | ($26,012,034) |
| 12/31/2020 | $1,116,077 | $29,600,162 | ($28,484,085) |
| 03/31/2021 | $936,069 | $29,959,993 | ($29,023,924) |

158.    Additional facts support the conclusion that the Debtor was insolvent, insufficiently capitalized, and/or unable to pay its debts as they became due during the periods relevant to this Complaint.  For example:

a.  The Debtor conducted its business with insufficient capital no later than December 31, 2013, and remained insufficiently capitalized at all relevant times thereafter, until the Petition Date;

b.  The Debtor incurred, was intending to incur, and/or believed that it would incur debts beyond its ability to pay such debts as they matured beginning on or after December 31, 2013, and continuing until the Petition Date;

c.  The Debtor experienced regular overdrafts and negative bank account balances at Valley National Bank and J.P. Morgan Chase Bank, N.A. during the relevant period;

d.  The Debtor failed to pay various creditors on a timely basis and could not timely meet its obligations as they became due during the relevant period;

e. The Debtor regularly held and delayed the issuance of checks payable to various creditors and otherwise prioritized the payment of certain payments to creditors to the detriment of other creditors;

f. Beginning during 2016 and continuing until April 2021, the Debtor borrowed and became obligated to repay at least $9.6 million in numerous high-interest-rate cash-advance transactions that purportedly pledged the Debtor's future accounts receivable as collateral for same-day cash;

g. On February 10, 2022, the Internal Revenue Service (the "IRS") filed proof of claim number 37 in the Chapter 7 Case (the "IRS POC"). The IRS POC lists obligations owed by the Debtor for unpaid employee-withholding taxes in the amount of $335,411.08 due for periods beginning in 2015;

h. In his plea agreement with the Manhattan District Attorney, Kossoff admitted that since at least December 2017, he stole more than $14 million from multiple persons and clients of the Debtor, including from the Debtor's IOLA accounts;  and

i. Proofs of Claim filed in the Chapter 7 Case total not less than $20 million.

## VIII.   The Debtor Is Forced into Bankruptcy

159.    On the Petition Date, creditors of the Debtor commenced the Chapter 7 Case by filing an involuntary petition for relief under Chapter 7 of the Bankruptcy Code against the Debtor in this Court.

160.    On May 11, 2021, this Court entered an order for relief under Chapter 7 of the Bankruptcy Code [Docket No. 14].

161.    On May 12, 2021, the Trustee was appointed as the Chapter 7 Interim Trustee of the Debtor [Docket No. 15];  he accepted his appointment, duly qualified, and is currently acting as the trustee of the Debtor's estate.

162. On December 15, 2021, the Debtor filed schedules of assets and liabilities and a statement of financial affairs [Docket No. 310], and on April 5, 2022, the Debtor filed amendments thereto [Docket No. 359] (cumulatively, the "Schedules").

163. In the Schedules, the Debtor listed Tenantracers as a co-debtor that is jointly and severally liable on various secured claims relating to prepetition transactions involving loans made to or for the benefit of either the Debtor or Tenantracers that are secured by assets of the Debtor and/or Tenantracers.

164. The Schedules list "advances and/or loans" from the Debtor to Tenantracers in "extremely significant" sums. The Debtor stated in the Schedules that these "advances and/or loans" lack documentation and, they are not expected to be repaid "inasmuch as they are all out of business and saddled with an extreme amount of priority or secured debt which greatly exceeds the minimal value of [Tenantracers'] existing assets" [Docket Nos. 310, 359].

165. On May 13, 2022, the Trustee served a subpoena upon Defendants and sought Defendants' production of documents and information pursuant to this Court's *Order Authorizing the Trustee to Issue Subpoenas and Obtain Testimony and for Injunctive Relief* entered on May 24, 2021 [Docket No. 27].

**IX.     The IRS Holds a Prepetition Claim Against the Debtor**

166. As of the Petition Date, the Debtor owed unpaid prepetition tax obligations to the IRS for the tax year ending December 31, 2015, which are subject to the IRS POC (the "IRS Claim").

167. The Debtor listed the IRS Claim as an unsecured priority claim in its Schedules in the amount of $382,000.

168. The IRS's right to assess the IRS Claim on account of 2015 tax liabilities arose no later than January 1, 2016.

169.    The Debtor received notice of the tax assessment underlying the IRS Claim no later than March 28, 2016.

170.    The IRS POC lists the obligation owed by the Debtor as unpaid taxes in the amount of $335,411.08 under the Federal Insurance Contributions Act.

171.    The IRS Claim, as set forth in the timely-filed IRS POC, is an allowable claim under section 502 of the Bankruptcy Code.

172.    The IRS Claim is a debt owed to the United States of America.

173.    The IRS is a predicate "creditor" within the meaning of section 544(b) of the Bankruptcy Code.

X.    **The Debtor's IOLA Accounts**

174.    Like other law firms in the State of New York, the Debtor was obligated to maintain, and at all relevant times, did maintain, in separate bank accounts: (1) funds that had been paid by the Debtor's clients as retainers for legal services to be rendered by the Debtor;  and (2) funds that the Debtor otherwise held in trust for its clients.

175.    Under New York law, law firms are required to segregate such escrow accounts from the firm's own accounts, and lawyers are strictly prohibited from using such escrowed funds unless and until the funds have been earned and deposited into the firm's/lawyer's own accounts.  Any interest or dividends that accrue on funds held in the segregated escrow accounts are the property of the client.

176.    The Debtor maintained what are known as Interest on Lawyer Account (the "IOLA Accounts") accounts to purportedly safeguard such client funds.

177.    Under New York law, when a lawyer or a law firm receives funds from a client in a fiduciary capacity and the lawyer determines that the funds are unlikely to generate sufficient interest income to justify the expense of administering a

segregated account for the client's benefit, the lawyer must deposit such funds into his IOLA account. Any interest or dividends that accrue on funds held in IOLA accounts are themselves segregated and periodically provided to the New York Interest on Lawyer Account Fund (the "IOLA Fund"), a New York government entity that distributes funds for the provision of basic legal services to the State's poor.

178.    At all relevant times, Kossoff improperly used the Debtor's IOLA Accounts as though they were common depositories of not only Debtor-client funds, but also his personal funds, loan proceeds, among other types of funds.

179.    Kossoff regularly deposited non-client funds into the Debtor's IOLA Accounts. Kossoff also regularly transferred funds from the Debtor's IOLA Accounts to and for the benefit of parties other than the Debtor's clients and the IOLA Fund, including himself, his family members, his personal creditors and the Landlord Defendants.

180.    For example, between February 2017 and the Petition Date, Kossoff deposited at least $51,000 from his personal checking accounts into the Debtor's IOLA Accounts, and he caused the Debtor to transfer at least $136,000 from the Debtor's IOLA Accounts into his personal checking accounts.

181.    The Debtor also transferred third-party and government loan proceeds into and out of its IOLA Accounts.

182.    In addition, the Debtor transferred $205,000 to Phyllis Kossoff, Kossoff's mother, from the Debtor's IOLA Accounts on account of Kossoff's personal obligations to her during the period of March 2014 through May 2018. A schedule of those deposits and transfers is annexed hereto as **Exhibit 3** and is incorporated by reference as if fully set forth herein.

183. Kossoff also improperly used funds in the Debtor's IOLA Accounts to transfer more than $1 million toward satisfaction of his personal liabilities through at least February 2021.

184. Moreover, Kossoff regularly caused the Debtor to transfer funds from its IOLA Accounts to its operating accounts without client authorizations.

185. In his May 2022 Plea Agreement (the "Plea Agreement") with the Manhattan District Attorney, Kossoff admitted that:

> a. From at least December 2017 to April 2021, I was an attorney licensed to practice in New York and the sole member of Kossoff PLLC, a law firm located in Manhattan. Part of my law firm's business was to collect and hold funds in trust for my clients and other individuals involved in matters relating to my clients. I did not have permissions or authority to disburse the funds without authorization from the relevant parties to do so.
>
> b. . . . I admit that, from on or about December 21, 2017 to on or about April 9, 2021, in the County of New York, I engaged in a systematic ongoing course of conduct with the intent to defraud more than one person and to obtain property from more than one person by false or fraudulent pretenses, representations, or promises. In doing so, I obtained more than $1,000 from such person. In particular, I defrauded multiple clients, by falsely representing that certain funds would be held in escrow and, notwithstanding those representations, intentionally causing unauthorized and impermissible disbursement of those funds.

A copy of the Plea Agreement is annexed hereto as **Exhibit 4**.

186. The Appendix to the Plea Agreement lists 35 persons and entities from whom Kossoff stole in total approximately $14.5 million, including amounts stolen from the Debtor's IOLA Accounts.

187. However, the Trustee's investigation to date, including his review of claims filed in the Chapter 7 Case and in other litigations against Kossoff and the

Debtor, has revealed that Kossoff stole approximately $18.5 million from the Debtor's clients.

188.    As a result of the commingling of funds in the Debtor's IOLA Accounts, transfers from the IOLA Accounts constitute transfers of funds in which the Debtor had an interest.

**XI.    Kossoff Admits Scheme to Defraud and is Sentenced to Prison**

189.    On December 13, 2021, in open court in New York, Kossoff pleaded guilty to, among other things, orchestrating a scheme to defraud the Debtor's creditors. As discussed above, Kossoff admitted that he stole at least $14.5 million from dozens of clients and others, including millions of dollars that had been deposited into the Debtor's bank IOLA and operating accounts.

190.    On May 6, 2022, New York State Supreme Court Judge Laurie Peterson sentenced Kossoff to serve not less than 4.5 years but not more than 13.5 years in prison as punishment for his crimes.

191.    Avoidable Payments totaling $144,270.65 were made during the period in which Kossoff admitted that his scheme to defraud took place.

192.    Plaintiff made written demands to Defendants for the return of the Avoidable Transfers months prior to the commencement of this Adversary Proceeding.

<u>COUNT I</u>

**AVOIDANCE AND RECOVERY OF**
**CONSTRUCTIVELY FRAUDULENT TRANSFERS**
**PURSUANT TO 11 U.S.C. §§ 544 and 550; NYDCL §§ 274-75 and 278-79; and**
**FDCPA §§ 3304(b)(1)(B) and 3306**

193.    Plaintiff repeats, reiterates and realleges each of the forgoing allegations of this Complaint as if fully set forth herein.

194.    Between March 7, 2014 and December 31, 2015, during the ten (10) years preceding the Petition Date, the Debtor made nineteen (19) transfers to, or for the benefit of, Unger totaling $172,136.05 (the "Group-One Transfers"), as identified by the dates and in the amounts set forth in the schedule which is annexed hereto as **Exhibit 5** and which is incorporated by reference as if fully set forth herein.

195.    The Debtor did not receive fair consideration or reasonably equivalent value in exchange for the Group-One Transfers because the Debtor did not receive any benefit from them.

196.    Instead, the Group-One Transfers benefited Unger and Kossoff who were the initial, immediate, and/or mediate transferees and the beneficiaries of the Group-One Transfers.

197.    The Debtor made the Group-One Transfers when the Debtor was engaged, and/or was about to engage, in business or transactions for which its remaining property after making the Group-One Transfers was an unreasonably small amount of capital.

198.    The Debtor remained inadequately capitalized as a result of the Group-One Transfers thereafter until the Petition Date.

199.    The Debtor made the Group-One Transfers when the Debtor intended to incur, believed that it would incur, and/or reasonably should have believed that it would incur debts beyond its ability to pay them as they matured and/or became due.

200.    The Debtor remained unable to pay its debts as they matured and/or became due as a result of the Group-One Transfers until the Petition Date.

201.    Pursuant to sections 502(d), 544 and 550(a) of the Bankruptcy Code and (a) sections 274, 275, 278, and/or 279 of the NYDCL and/or (b) sections

3304(b)(1)(B)(i), 3304(b)(1)(B)(ii), and 3306 of the FDCPA, Plaintiff is entitled to a

judgment against Defendant Unger:  (i) avoiding the Group-One Transfers;

(ii) recovering each Group-One Transfer and/or its value from Unger;  (iii) disallowing

any claim filed by Unger until such time as each Group-One Transfer and/or its value is

repaid to the Plaintiff;  (iv) awarding attorneys' fees and costs from Unger;  and

(v) awarding any other relief that the Court deems just and proper.

**COUNT II**

**AVOIDANCE AND RECOVERY OF**
**FRAUDULENT TRANSFERS PURSUANT TO**
**11 U.S.C. §§ 544 and 550; NYDCL §§ 276, 276-a, and 278-79; and**
**FDCPA §§ 3304(b)(1)(A) and 3306**

202.    Plaintiff repeats, reiterates, and realleges each of the foregoing

allegations of this Complaint as if fully set forth herein.

203.    Under oath and in open court at the hearing at which the New York

court accepted his Plea Agreement, Kossoff admitted to "engag[ing] in a systematic

ongoing course of conduct with the intent to defraud . . . multiple clients of [his] law

firm"—present and/or future creditors of the Debtor—"[f]rom at least December 2017

to April 2021."

204.    The Debtor made the Group-One Transfers with actual intent to

hinder, delay, or defraud one or more present and/or future creditors of the Debtor.

205.    The Group-One Transfers did not, and were not intended to,

benefit the Debtor.

206.    The Group-One Transfers were intended to benefit Unger and

Kossoff, who were the initial, immediate, and/or mediate transferees and the

beneficiaries of the Group-One Transfers.

207. Each of the Group-One Transfers transferred the Debtor's assets for the benefit of insider Kossoff by reducing his personal obligations under the 2013 Agreement and currying favor with a sitting New York State judge in a court in which the Debtor practices, all to the detriment of the Debtor's present and/or future creditors.

208. Pursuant to sections 502(d), 544, 550(a), and 551 of the Bankruptcy Code, and (a) sections 276, 276-a, 278, and/or 279 of the NYDCL and/or (b) sections 3304(b)(1)(A) and 3306 of the FDCPA, Plaintiff is entitled to a judgment against Unger: (i) avoiding the Group-One Transfers; (ii) recovering each Group-One Transfer and/or its value from Unger; (iii) disallowing any claim filed by Unger until such time as each Group-One Transfer and/or its value is repaid to the Plaintiff; (iv) awarding attorneys' fees and costs from Unger; and (v) awarding any other relief that the Court deems just and proper.

## COUNT III

### AVOIDANCE AND RECOVERY OF
### CONSTRUCTIVELY FRAUDULENT TRANSFERS PURSUANT TO
### TO 11 U.S.C. §§ 544 and 550; NYDCL §§ 273-75 and 278-79; and
### FDCPA §§ 3304 and 3306

209. Plaintiff repeats, reiterates, and realleges each of the foregoing allegations of this Complaint as if fully set forth herein.

210. Between January 1, 2016 and April 5, 2018, during the six (6) years preceding the Petition Date, the Debtor made transfers to, or for the benefit of, Unger totaling $49,770.65 (the "Group-Two Transfers"), as identified by the dates and in the amounts set forth in the schedule which is annexed hereto as **Exhibit 6** and which is incorporated by reference as if fully set forth herein.

211.   The Debtor did not receive fair consideration or reasonably equivalent value in exchange for the Group-Two Transfers because the Debtor did not receive any benefit from them.

212.   Instead, the Group-Two Transfers benefited Unger and Kossoff who were the initial, immediate, and/or mediate transferees and the beneficiaries of the Group-Two Transfers.

213.   Each of the Group-Two Transfers transferred the Debtor's assets for the benefit of insider Kossoff by reducing his personal obligations under the 2013 Agreement and currying favor with a sitting New York State judge in a court in which the Debtor practiced, all to the detriment of the Debtor's present and/or future creditors.

214.   The Debtor was insolvent when each of the Group-Two Transfers were made, or was rendered or became insolvent as a result of the Group-Two Transfers.

215.   The Debtor made the Group-Two Transfers when the Debtor was engaged, and/or was about to engage, in business or transactions for which its remaining property after making the Group-Two Transfers was an unreasonably small amount of capital.

216.   The Debtor remained inadequately capitalized as a result of the Group-Two Transfers and thereafter until the Petition Date.

217.   The Debtor made the Group-Two Transfers when the Debtor intended to incur, believed that it would incur, and/or reasonably should have believed that it would incur debts beyond its ability to pay them as they matured and/or became due.

218. The Debtor remained unable to pay its debts as they matured and/or became due as a result of the Group-Two Transfers and thereafter until the Petition Date.

219. Pursuant to sections 502(d), 544, and 550(a) of the Bankruptcy Code and (a) sections 273, 274, 275, 278, and/or 279 of the NYDCL and/or (b) sections 3304(a)(1), 3304(b)(1)(B)(i), 3304(b)(1)(B)(ii), and 3306 of the FDCPA, Plaintiff is entitled to a judgment against Unger: (i) avoiding the Group-Two Transfers; (ii) recovering each Group-Two Transfer and/or its value from Unger; (iii) disallowing any claims filed by Unger until such time as each Group-Two Transfer and/or its value is repaid to the Plaintiff; (iv) awarding attorneys' fees and costs from Unger; and (v) awarding any other relief that the Court deems just and proper.

## COUNT IV

### AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO
### 11 U.S.C. §§ 544 and 550; NYDCL §§ 276, 276-a, and 278-79; and
### FDCPA §§ 3304(b)(1)(A) and 3306

220. Plaintiff repeats, reiterates, and realleges each of the foregoing allegations of this Complaint as if fully set forth herein.

221. Under oath and in open court at the hearing at which the New York court accepted his Plea Agreement, Kossoff admitted to "engag[ing] in a systematic ongoing course of conduct with the intent to defraud . . . multiple clients of [his] law firm"—present and/or future creditors of the Debtor—"[f]rom at least December 2017 to April 2021."

222. The Debtor made the Group-Two Transfers with actual intent to hinder, delay, or defraud one or more present and/or future creditors of the Debtor.

223. The Group-Two Transfers did not, and were not intended to, benefit the Debtor.

224. Instead, the Group-Two Transfers benefited Unger and Kossoff who were the initial, immediate, and/or mediate transferees and the beneficiaries of the Group-Two Transfers.

225. Each of the Group-Two Transfers transferred the Debtor's assets for the benefit of insider Kossoff by reducing his personal obligations under the 2013 Agreement and currying favor with a sitting New York State judge in the court in which the Debtor practiced, all to the detriment of the Debtor's present and/or future creditors.

226. Pursuant to sections 502(d), 544, and 550(a) of the Bankruptcy Code and (a) sections 276, 276-a, 278, and/or 279 of the NYDCL, and/or (b) sections 3304(b)(1)(A) and 3306 of the FDCPA, Plaintiff is entitled to a judgment against Unger: (i) avoiding the Group-Two Transfers; (ii) recovering each Group-Two Transfer and/or its value from the Unger to whom each Group-Two Transfer was made; (iii) disallowing any claim filed by Unger until such time as each Group-Two Transfer and/or its value is repaid to the Plaintiff; (iv) awarding attorneys' fees and costs from Unger; and (v) awarding any other relief that the Court deems just and proper.

## COUNT V

### AVOIDANCE AND RECOVERY OF PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. §§ 547(b) AND 550

227. Plaintiff repeats, reiterates, and realleges each of the following allegations of this Complaint as if fully set forth herein.

228. Within ninety (90) days prior to the Petition Date, the Debtor made transfers to, or for the benefit of, Defendants totaling $110,000 (the "Preferential

Transfers") as identified by date and amount in the schedule which is annexed hereto as **Exhibit 7** and which is incorporated by reference as if fully set forth herein.

229. Subject to proof, the Plaintiff pleads, in the alternative, that to the extent that either Defendant demonstrates that the Preferential Transfers were made for or on account of an antecedent debt owed by the Debtor to Defendants before the Preferential Transfers were made: (a) the Debtor was insolvent at the time the Preferential Transfers were made; and (b) the Preferential Transfers enabled Defendants to receive more than they would have received if this Chapter 7 Case were under Chapter 7 of the Bankruptcy Code, the Preferential Transfers had not been made, and the antecedent debt were paid to the extent provided under the Bankruptcy Code.

230. Plaintiff is entitled to the presumption of the Debtor's insolvency pursuant to section 547(f) of the Bankruptcy Code.

231. Pursuant to sections 547(b) and 550(b) of the Bankruptcy Code, Plaintiff is entitled to a judgment against either Defendant: (i) avoiding the Preferential Transfers; (ii) recovering the Preferential Transfers and/or their value from the Defendant to whom or to whose benefit the Preferential Transfers were made; (iii) disallowing any claim that any Defendant may have against the Debtor until such time as the Preferential Transfers and/or their value are repaid to the Plaintiff; (iv) awarding attorneys' fees and costs from Defendants; and (v) awarding any other relief that the Court deems just and proper.

### RESERVATION OF RIGHTS

232. The Trustee does not waive and instead specifically reserves all of his rights, claims, and defenses as they pertain to the Debtor and any claims or liens that Defendants may assert against the Debtor's estate. The Trustee expressly reserves the

right to amend and supplement this Complaint or to commence a new action against the Defendants with other claims as his investigation continues.

WHEREFORE, for the foregoing reasons, the Trustee respectfully requests that this Court enter judgment against Defendants:

a. avoiding all Avoidable Payments pursuant to sections 544 and 547 of the Bankruptcy Code; NYDCL sections 273 *et seq.*; and sections 3304 and 3306 of the FDCPA;

b. pursuant to section 550(a) and (c) of the Bankruptcy Code, directing Defendants to pay to Plaintiff an amount to be determined at trial that is not less than the full value of the Avoidable Payments or, in the alternative, the Preferential Transfers, that each of the Defendants received, plus interest and costs;

c. preserving all avoided transfers and liens for the benefit of the Debtor's estate pursuant to section 551 of the Bankruptcy Code;

d. disallowing any of Defendants' claims pursuant to section 502(d) of the Bankruptcy Code;

e. awarding pre-judgment interest at the maximum legal rate running from the date of the Plaintiff's first demand to Defendants to return all Avoidable Transfers to the date of judgment with respect to this Complaint (the "Judgment") herein;

f. awarding post-judgment interest at the maximum legal rate running from the date of the Judgment until the date the Judgment is paid in full, plus costs;

g. requiring Defendants to pay forthwith the amount of the Judgment; and

h. granting Plaintiff such other and further relief as the Court deems just and proper.

Dated: New York, New York
      June 12, 2023

ALBERT TOGUT, not individually but
solely in his capacity as Chapter 7 Trustee,
By his Attorneys,
TOGUT, SEGAL & SEGAL LLP
By:

*/s/ Neil Berger*
ALBERT TOGUT
NEIL BERGER
MINTA J. NESTER
One Penn Plaza
New York, New York 10119
(212) 594-5000

# EXHIBIT 1

## 2013 Agreement Payments

**EXHIBIT 1**

**2013 Agreement Payments**

| Payee | Debtor Bank | Check No. | Payment Date | Payment Amount |
|---|---|---|---|---|
| Sally E. Unger | JPM Chase | 15223 | 3/7/14 | $12,000.00 |
| Sally E. Unger | JPM Chase | 15248 | 3/14/14 | $6,500.00 |
| Sally E. Unger | JPM Chase | 15282 | 3/19/14 | $5,500.00 |
| Sally E. Unger | JPM Chase | 15327 | 3/28/14 | $9,000.00 |
| Sally E. Unger | JPM Chase | 15425 | 4/18/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 15714 | 6/24/14 | $7,500.00 |
| Sally E. Unger | JPM Chase | 15960 | 8/13/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 16230 | 9/17/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 16271 | 9/23/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 16361 | 10/8/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 16607 | 11/10/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 16650 | 11/13/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 16780 | 11/26/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 16942 | 12/18/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 17075 | 12/31/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 20360 | 2/20/15 | $5,000.00 |
| Sally E. Unger | JPM Chase | 20425 | 2/27/15 | $3,000.00 |
| Sally E. Unger | JPM Chase | 20503 | 3/9/15 | $3,000.00 |
| Sally E. Unger | JPM Chase | 22533 | 8/31/15 | $70,636.05 |
| Sally E. Unger | JPM Chase | 24280 | 1/19/16 | $5,500.00 |
| Sally E. Unger | JPM Chase | 24760 | 2/26/16 | $10,000.00 |
| Sally E. Unger | JPM Chase | 30675 | 5/25/17 | $40.00 |
| Sally E. Unger | JPM Chase | 31982 | 9/1/17 | $27,230.65 |
| Sally E. Unger | JPM Chase | 8593 | 4/5/18[1] | $7,000.00 |
| | | **Total 2013 Agreement Payments:** | | **$221,906.70** |

---

[1]     Payment made with funds from the Debtor's IOLA Account.

# EXHIBIT 2

## 2021 Loan Payments

**EXHIBIT 2**

**2021 Loan Payments**

| Payee | Debtor Bank | Check No. | Payment Date | Payment Amount |
|-------|-------------|-----------|--------------|----------------|
| Unger Trust | Valley National | Wire | 2/19/21 | $62,500.00 |
| Unger Trust | Signature Bank | Wire | 3/19/21 | $47,500.00 |
| | | | | |
| | | **Total 2021 Loan Payments:** | | **$110,000.00** |

## EXHIBIT 3

## Kossoff Deposits into and Debtor Transfers out of Debtor's IOLA Accounts

# EXHIBIT 3

## Kossoff Deposits into and Debtor Transfers out of Debtor's IOLA Accounts

| Transaction Date | Payee/Payor | Transaction Type | Amount |
|---|---|---|---|
| **Transfers into IOLA from M. Kossoff** | | | |
| | | | |
| 2/14/17 | Mitchell H Kossoff Pamela A Kossoff | Transfer | $25,000.00 |
| 2/25/17 | Mitchell H Kossoff Pamela A Kossoff | Transfer | $21,000.00 |
| 1/7/21 | Mitchell Hal Kossoff | Transfer | $5,000.00 |
| | **Total Transfers from M. Kossoff:** | | **$51,000.00** |
| | | | |
| **Transfers from IOLA** | | | |
| 3/19/14 | Phyllis Kossoff | Check | $25,000.00 |
| 12/21/16 | Phyllis Kossoff | Check | $40,000.00 |
| 1/4/17 | Phyllis Kossoff | Check | $40,000.00 |
| 2/15/17 | Mitchell H Kossoff Pamela A Kossoff | Transfer | $25,000.00 |
| 3/10/17 | Mitchell H Kossoff Pamela A Kossoff | Transfer | $21,000.00 |
| 2/9/18 | Mitchell Hal Kossoff | Transfer | $65,000.00 |
| 5/5/18 | Phyllis Kossoff | Check | $100,000.00 |
| 3/3/21 | Mitchell Hal Kossoff | Transfer | $25,000.00 |
| | **Total Transfers from IOLA:** | | **$341,000.00** |

**EXHIBIT 4**

**Plea Agreement**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART N

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK | PLEA AGREEMENT |
| -against- | Docket No. CR-028944-21NY |
| MITCHELL KOSSOFF, | SCI No. |
| Defendant. | |

1. This is the plea agreement (the "Agreement") between the Office of the District Attorney of the County of New York (the "District Attorney") and Mitchell Kossoff (the "Defendant"). This Agreement constitutes the entire agreement between the Defendant and the District Attorney. There are no promises, agreements, or conditions, express or implied, other than those set forth in this document. No modification, deletion, or addition to this Agreement will be valid or binding on either party unless put into writing, signed by both parties, and approved by the Court.

2. At the time of the Defendant's plea, this Agreement shall be made a part of the record and the parties will request the Court's approval thereof. This Agreement will become effective only upon the Court's approval.

3. This Agreement covers the criminal conduct to which the Defendant is pleading guilty under this Agreement. No other criminal conduct is covered by the terms of this Agreement. This Agreement is limited to the District Attorney and cannot and does not bind other government agencies.

4. Pursuant to this Agreement, the Defendant shall waive prosecution by indictment and plead guilty under a Superior Court Information to one count of Scheme to Defraud in the First Degree (Penal Law § 190.65[1][b]), one count of Grand Larceny in the First Degree (Penal Law § 155.42), one count of Grand Larceny in the Second Degree (Penal Law § 155.40[1]), and one count of Grand Larceny in the Third Degree (Penal Law § 155.35[1]). The Defendant acknowledges that the maximum sentences that can be imposed for convictions of such offenses are as follows: an indeterminate prison term of 8 1/3 to 25 years for Grand Larceny in the First Degree (a Class B felony); an indeterminate prison term of 5 to 15 years for Grand Larceny in the Second Degree (a Class C felony); an indeterminate prison term of 2 1/3 to 7 years for Grand Larceny in the Third Degree (a Class D felony); and an indeterminate prison term of 1 1/3 to 4 years for Scheme to Defraud in the First Degree (a Class E felony).

5. The Defendant acknowledges that by entering this plea of guilty, he will forfeit certain constitutional rights, including the right to a trial by jury, the right to confront his

accusers, and the privilege against self-incrimination. The Defendant specifically will waive, and hereby waives, all defenses and any claims or protections with relation to his plea arising out of any federal or state rights concerning double jeopardy, statute of limitations, speedy trial, speedy sentence, delayed prosecution, geographical jurisdiction, or venue.

6. The Defendant shall execute a Waiver of Right to Appeal at the time of his plea. The Defendant shall acknowledge, and hereby acknowledges, that he would ordinarily retain his right to appeal even after pleading guilty, but that in this case, he is knowingly and voluntarily waiving that right in exchange for the favorable plea and sentence that he is receiving. The Defendant shall also acknowledge, and hereby acknowledges, that the appellate rights he is waiving are separate and apart from those rights that he shall automatically forfeit by his guilty plea.

7. Upon the Defendant's plea of guilty, he will admit under oath before the Court to the following:

    a. From at least December 2017 to April 2021, I was an attorney licensed to practice in New York and the sole member of Kossoff PLLC, a law firm located in Manhattan. Part of my law firm's business was to collect and hold funds in trust for my clients and other individuals involved in matters relating to my clients. I did not have permission or authority to disburse the funds without authorization from the relevant parties to do so.

    b. As charged in Count One of the Superior Court Information, I admit that, from on or about December 21, 2017 to on or about April 9, 2021, in the County of New York, I engaged in a systematic ongoing course of conduct with the intent to defraud more than one person and to obtain property from more than one person by false or fraudulent pretenses, representations, or promises. In doing so, I obtained more than $1,000 from such persons. In particular, I defrauded multiple clients of my law firm, and other persons involved in matters relating to my clients, by falsely representing that certain funds would be held in escrow and, notwithstanding those representations, intentionally causing unauthorized and impermissible disbursements of those funds.

    c. As part of that scheme, and as charged in Counts Two through Four of the Superior Court Information, I admit to committing the following specific thefts, in the County of New York, from clients of my firm and other persons involved in matters relating to my clients:

        i. From on or about December 21, 2017 through on or about March 16, 2021, I stole more than $50,000 from Anolag LLC and Jacpot 2 LLC.

ii. From on or about July 9, 2019 through on or about March 16, 2021, I stole more than $1,000,000 from 118 Duane LLC.

iii. From on or about April 1, 2021 through on or about April 9, 2021, I stole more than $3,000 from Irwin Ostrega.

d. I admit that the individuals and entities listed in the appendix attached to my written plea agreement are some of the victims of the crimes to which I am pleading guilty today. I also admit that, by committing those crimes, I caused those victims to incur the losses listed in the appendix and that I owe those amounts to those victims.

8. The Defendant acknowledges that the individuals and entities listed in the appendix attached to this Agreement (the "Appendix") are victims of the crimes to which the Defendant is pleading guilty. The Defendant also acknowledges that the monetary amounts listed in the Appendix reflect losses that he caused and owes to the respective victims as a result of his crimes. The District Attorney and the Defendant agree that, at the time of the Defendant's sentencing, and as part of the Defendant's sentence, the Court shall issue judgment orders against the Defendant in favor of those victims listed in the Appendix. The Defendant acknowledges the bases for those judgment orders and agrees to waive, and hereby waives, any restitution/reparation hearing pursuant to Penal Law § 60.27(2) and Criminal Procedure Law § 400.30 in connection with his guilty pleas under this Agreement.

9. The Defendant represents that he has full and sole title to a condominium with an address of Twinlights Terrace, Unit I-9, Highlands, New Jersey, 07732 (Block: 11.08; Lot: 9) (the "Condominium"), with a last known tax assessment value of approximately $311,400 for the year 2021, according to the public records of the Monmouth County Clerk's Office. Prior to the Defendant's sentencing, and as a condition of the promised sentences set forth in paragraph 10 below, the Defendant shall transfer title to the Condominium to Albert Togut (not individually but solely in his capacity as Chapter 7 Interim Trustee for Kossoff PLLC) and provide proof of such transfer to the District Attorney. If the transfer has not occurred prior to the Defendant's sentencing, the Defendant must show good cause why the transfer was not performed. The Defendant agrees that it shall be within the District Attorney's sole discretion to determine whether the transfer occurred or whether the Defendant has demonstrated good cause why it did not.

10. The District Attorney and the Defendant agree that if the Defendant satisfies all of the conditions sets forth in this Agreement, as determined solely by the District Attorney, the District Attorney shall recommend and the Court shall impose the following indeterminate prison terms for the crimes to which the Defendant is pleading guilty, with all of the sentences to be run concurrently: 4.5 to 13.5 years for the count of Grand Larceny in the First Degree; 4.5 to 13.5 years for the count of Grand Larceny in the Second Degree; 2 1/3 to 7 years for the count of Grand Larceny in the Third Degree; and 1 1/3 to 4 years for the count of Scheme to Defraud in the First Degree.

11.    The District Attorney and the Defendant further agree that, between the date of the Defendant's guilty plea and the date of his sentencing, the Defendant shall return to court on all scheduled court dates, report to the New York City Department of Probation as ordered by the Court, and refrain from any behavior that would cause him to be re-arrested on criminal charges.  If the Defendant fails to satisfy any of those conditions or the conditions set forth in paragraph 9 above, as determined solely by the District Attorney, the District Attorney can recommend, and the Court can impose, any sentences authorized by law for the offenses to which the Defendant is pleading guilty under this Agreement.

12.    The Defendant enters into this Agreement, including all waivers contained herein, knowingly, intelligently, and voluntarily and after discussion and consultation with his attorney, Walter Mack.  The Defendant has had a full opportunity to discuss this Agreement with his attorney, and any questions he may have had have been answered to his satisfaction.

Dated: New York, New York

_____


_____        _____
Mitchell Kossoff                                 Doar Rieck Kaley & Mack
Defendant                                        Attorney for Defendant



_____        _____
Ryan Gee                                         Catherine McCaw
Assistant District Attorney                      Assistant District Attorney




Approved: _____
              Justice of the Supreme Court

4

# APPENDIX TO PLEA AGREEMENT
## PEOPLE V. MITCHELL KOSSOFF (DOCKET NO. CR-028944-21NY)

| VICTIM | AMOUNT OWED |
|---|---|
| Gran Sabana Corporation | $4,478,784.24 |
| 118 Duane LLC | $2,425,000.00 |
| SSM Realty Group II LLC | $1,300,000.00 |
| Darlene Hart and Lorraine Kinyk | $1,250,000.00 |
| Decker Associates LLC | $800,000.00 |
| 537 Realty Associates LLC | $590,000.00 |
| Prince Street Holdings LLC | $525,000.00 |
| Sasson Real Estate Group | $342,500.00 |
| Ilomai Kurrik and Arthur Nigel Jones | $305,064.16 |
| Heiner Freidrich | $291,000.00 |
| Louis Girodano and Jeanmarie Giordano | $250,000.00 |
| Jonathan Ostrow | $250,000.00 |
| Anolag LLC and Jacpot 2 LLC | $220,051.88 |
| 47 Mercer Street I LLC, 47 Mercer Street II LLC, 47 Mercer Street III LLC, and 47 Mercer Street IV LLC | $199,600.38 |
| Irwin Ostrega | $159,584.93 |
| Chad Eggers | $158,000.00 |
| Centennial Properties NY Inc. | $150,000.00 |
| Lawrence A. Alexander Irrevocable Trust | $117,000.00 |
| Robert Altemus | $89,900.00 |
| Darren Katz and Peter Myers | $77,000.00 |
| 5557 LLC | $75,000.00 |
| 51 West 11 Realty LLC and Beth Mollins | $65,000.00 |
| Georgica Capital Partners LLC | $61,250.00 |
| CF E 88 LLC and SM E 88 LLC | $60,000.00 |
| Thomas Sneva | $57,300.00 |
| 6 West 75th Street LLC and 112-113 West 75th Street LLC | $55,187.73 |
| Robert Rugani | $49,900.00 |
| Delis Realty Corporation | $45,000.00 |
| 112-113 West 75th Street LLC | $40,000.00 |
| Estate of Jasper Edward Peyton, Jr. | $34,000.00 |
| Jason Breitstone | $30,625.00 |
| David Shorenstein | $30,625.00 |
| Jason Rosenblum | $17,410.13 |
| 6 West 75th Street LLC | $10,000.00 |
| David Svenson | $7,589.87 |

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

---

**THE PEOPLE OF THE STATE OF NEW YORK**

-against-

**MITCHELL KOSSOFF,**

                                                    **Defendant.**

---

**PLEA AGREEMENT**

**DOCKET NO.**

**SCI NO.**

---

**Cyrus R. Vance, Jr.**
**District Attorney**
**New York County**
**One Hogan Place**
**New York, New York 10013**
**(212) 335-9000**

**Ryan Gee**
**Assistant District Attorney**
**Of Counsel**

# EXHIBIT 5

# Group-One Transfers

# EXHIBIT 5

## Group-One Transfers

| Payee | Debtor Bank | Check No. | Payment Date | Payment Amount |
|---|---|---|---|---|
| Sally E. Unger | JPM Chase | 15223 | 3/7/14 | $12,000.00 |
| Sally E. Unger | JPM Chase | 15248 | 3/14/14 | $6,500.00 |
| Sally E. Unger | JPM Chase | 15282 | 3/19/14 | $5,500.00 |
| Sally E. Unger | JPM Chase | 15327 | 3/28/14 | $9,000.00 |
| Sally E. Unger | JPM Chase | 15425 | 4/18/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 15714 | 6/24/14 | $7,500.00 |
| Sally E. Unger | JPM Chase | 15960 | 8/13/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 16230 | 9/17/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 16271 | 9/23/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 16361 | 10/8/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 16607 | 11/10/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 16650 | 11/13/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 16780 | 11/26/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 16942 | 12/18/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 17075 | 12/31/14 | $5,000.00 |
| Sally E. Unger | JPM Chase | 20360 | 2/20/15 | $5,000.00 |
| Sally E. Unger | JPM Chase | 20425 | 2/27/15 | $3,000.00 |
| Sally E. Unger | JPM Chase | 20503 | 3/9/15 | $3,000.00 |
| Sally E. Unger | JPM Chase | 22533 | 8/31/15 | $70,636.05 |
| | | | | |
| | | | Total Group-One Transfers: | $172,136.05 |

**EXHIBIT 6**

**Group-Two Transfers**

## EXHIBIT 6

## Group-Two Transfers

| Payee | Debtor Bank | Check No. | Payment Date | Payment Amount |
|---|---|---|---|---|
| Sally E. Unger | JPM Chase | 24280 | 1/19/16 | $5,500.00 |
| Sally E. Unger | JPM Chase | 24760 | 2/26/16 | $10,000.00 |
| Sally E. Unger | JPM Chase | 30675 | 5/25/17 | $40.00 |
| Sally E. Unger | JPM Chase | 31982 | 9/1/17 | $27,230.65 |
| Sally E. Unger | JPM Chase | 8593 | 4/5/18[1] | $7,000.00 |
| | | **Total Group-Two Transfers:** | | **$49,770.65** |

---

[1]    Payment made with funds from the Debtor's IOLA Account.

# EXHIBIT 7

## Preferential Transfers

## EXHIBIT 7

## Preferential Transfers

| Payee | Debtor Bank | Check No. | Payment Date | Payment Amount |
|---|---|---|---|---|
| Unger Trust | Valley National | Wire | 2/19/21 | $62,500.00 |
| Unger Trust | Signature Bank | Wire | 3/19/21 | $47,500.00 |
| | | | | |
| | | **Total 2021 Loan Payments:** | | **$110,000.00** |